UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

IBERIABANK, a Louisiana banking
corporation, as successor in
interest to Orion Bank,

          Plaintiff,

vs.                         Case No.  2:11-cv-321-FtM-29DNF

COCONUT 41, LLC, a Florida limited
liability company, et al.,


          Defendants.
_____

WESTWIND CONTRACTING, INC.,

      Third-party Plaintiff,

vs.


HG COCONUT, LLC, a Florida limited
liability company,

      Third-party Defendant.
_____

HG COCONUT, LLC,

      Cross-claim Plaintiff,

vs.

WESTWIND CONTRACTING, INC.,

      Cross-claim Defendant.
_____

HG COCONUT, LLC,

       Third-party Plaintiff,

vs.

IBERIABANK, a Louisiana banking
corporation, as successor in
interest to Orion Bank,

       Third-party Defendant.

_____

**OPINION AND ORDER**

This matter came before the Court on August 27, 28, and 29, 2013 for a non-jury trial on various claims among the remaining parties. As the parties state in the Joint Pretrial Statement, this lawsuit arises from the failed development of the Coconut Crossings Master Plan Development ("Coconut Crossing"), a mixed-use commercial retail center. (Doc. #285, p. 1.) The last three parties with outstanding claims and/or defenses are Westwind Contracting, Inc. (Westwind Contracting), H.G. Coconut, LLC (HG Coconut), and IberiaBank. The Court's findings of fact and conclusions of law are set forth below.

**I.**

The first issue concerns the district court's subject-matter jurisdiction. This case was removed from state court by the Federal Deposit Insurance Corporation as Receiver (FDIC-R) based upon the presence of FDIC-R as a defendant in a counterclaim (Doc. #1). When FDIC-R was dropped as a party due to settlement, the

Court initially suggested there was no longer federal jurisdiction, but allowed the parties to address the issue (Doc. #165). IberiaBank filed a Response (Doc. #169) arguing that subject-matter jurisdiction continued to exist.  The Court ultimately agreed, and entered an Order (Doc. #195) noting that while the Eleventh Circuit had not yet decided the issue, it was satisfied that the district court continued to have subject-matter jurisdiction.  The Eleventh Circuit has now decided the issue, holding in Lindley v. FDIC, ___ F.3d ____, 2013 WL 4269389, *10 (11th Cir. Aug. 16, 2013), "that when the FDIC is a party to a civil suit and removes that case to federal Court, the District Court has original jurisdiction over claims against non-FDIC defendants, and this jurisdiction is not lost if the FDIC is later dismissed from the case."  Accordingly, the Court has subject-matter jurisdiction over the case.

IberiaBank asserts, for a different reason, that the Court nonetheless lacks subject-matter jurisdiction over one of the claims, i.e., the breach of contract claim against it by HG Coconut.  The Court addresses its jurisdiction over that particular claim later in this Opinion and Order.

**II.**

The Court finds that the evidence establishes the following facts by at least a preponderance of the evidence.

## A.   Contract to Purchase Coconut Crossing

In or about March 2005, Land Development Group, LLC (Land Development Group) executed a Purchase and Sales Agreement to purchase property at the northwest corner of Coconut Drive and Route 41 in Estero, Florida from Coconut North Properties, Ltd. The parties refer to this property as the yet-to-be subdivided/platted master development known as Coconut Crossing. The details of the contract are not material to this litigation.

## B.  Contract to Sell Portion of Coconut Crossing

Prior to closing on the Purchase and Sales Agreement, Land Development Group executed a contract to sell a portion of the Coconut Crossing property to HG Coconut.  As of July 2, 2005, Land Development Group, as the contract vendee of the Coconut Crossing property under the Purchase and Sales Agreement, entered into a Commercial Vacant Land Purchase Contract and an Addendum (collectively the Land Purchase Contract) to sell a portion of the Coconut Crossing property to HG Coconut.  IberiaBank Exh. B.[1]  The Land Purchase Contract identified Land Development Group as the "Developer" and HG Coconut as the Purchaser.  Id., p. 1.  The Land Development Group agreed to sell approximately 14.41 acres of the Coconut Crossing property, designated as Development Area 2, to HG Coconut for $9.8 million.  Id., Add. §1(a).  Land Development Group

---

[1]Several of the exhibits were introduced by more than one party.  The Court only makes reference to one copy of each pertinent exhibit.

would retain the area designated as Development Area 1 (approximately 32 acres), as well as a number of out-parcels (collectively the Developer's Property).

In the Land Purchase Contract Addendum, both Land Development Group and HG Coconut agreed that "their respective projects are tandem parts of a Master Plan Development," IberiaBank Exh. B, Add. §8(a), and agreed to cooperate with each other in a number of areas, see generally id., §8. Additionally, Land Development Group agreed that it "will be and remain the owner of the adjacent Developer's Property" and that it "shall retain title to Developer's Property and continue to be responsible for performance of Developer's obligations under this Agreement until Developer has completely performed all of Developer's obligations under this Agreement, including without limitation those obligations of Developer under Sections 8 and 9 of this Addendum." Id. §3(d).

As to the infrastructure for the vacant land, the parties agreed that Land Development Group was responsible at its sole expense to install all facilities and improvements outside of Development Area 2 which would be governmentally required for the development of Development Area 2 and the Developer's Property. Id. §9(a). This included an appropriately sized sewage lift station and service lines to the Development Area 2 boundary. Id. §9(a)(i), (ii). Additionally, the parties agreed that the cost to widen Coconut Road was "solely the Developer's expense and that

Purchaser shall incur no expenses therefor." Id. §9(a)(iii). As "security" for Land Development Group's infrastructure obligations, HG Coconut's counsel, the law firm of Woodward, Pires & Lombardo (WPL), was to hold ten percent (10%) of the purchase price "in escrow at and after Closing until completion of performance by Developer of such obligations." Id. §9(b).

The parties anticipated a simultaneous closing of the Purchase and Sales Agreement (by which Land Development Group would obtain ownership of the Coconut Crossing property) and the Land Purchase Contract (by which Land Development Group would convey ownership of Development Area 2 to HG Coconut). Id., Add. §4. Sometime prior to closing, Land Development Group formed Coconut 41, LLC (Coconut 41) and conveyed its interest in the Land Purchase Contract to Coconut 41. Coconut 41 obtained a $25 million loan from Orion Bank to purchase and develop the Coconut Crossing property. HG Coconut Exh. 18. HG Coconut financed the purchase of Development Area 2 through a loan from Mercantile Bank. (Doc. #285, Joint Pretrial Statement, p. 2.)

## C. Creation of §9(b) WPL Escrow Agreement

As required by §9(b) of the Land Purchase Contract Addendum, an escrow account was created to hold ten percent of the purchase price until completion of the infrastructure work by Coconut 41. An Escrow Agreement dated August 10, 2005, between Coconut 41 and HG Coconut provided that $978,000.00 of the purchase price be

placed in escrow with WPL, as escrow agent. IberiaBank Exh. C, §1. The money was to be released to Coconut 41 upon proof of completion of the infrastructure work. Id., §3. Interest on the escrow amount belonged to HG Coconut. Id., §4.

## D. **Simultaneous Closing and Escrow Account Funding**

The simultaneous closing was held on August 16, 2005. Coconut 41 purchased the entire tract of vacant land (Development Area 1, Development Area 2, and out-parcels), and then sold Development Area 2 to HG Coconut. As a result, HG Coconut took title to Development Area 2 and Coconut 41 took title to Development Area 1 and various outparcels. Coconut 41 did not retain any interest in the real property purchased by HG Coconut, and HG Coconut did not have any interest in Development Area 1 or the out-parcels. The §9(b) WPL Escrow Account was funded with $978,000 of the purchase money. Appropriate deeds, mortgages, and other documents were recorded on August 17, 2005. HG Coconut, Exh. 2. At all times thereafter relevant to this case, HG Coconut was the sole owner of Development Area 2.

David Leve (Mr. Leve), HG Coconut's in-house counsel, testified at trial that HG Coconut and Coconut 41 were co-owners in the Coconut Road Master Plan Development, and to that extent would be considered co-developers. Mr. Leve testified that HG Coconut viewed itself as a co-developer of the Coconut Crossings project to the extent provided in the Land Purchase Agreement.

E.   **Infrastructure Work Contracts**

Westwind Contracting is a heavy construction contractor that performs infrastructure and road building work.  On June 16, 2006, and August 15, 2006, respectively, Coconut 41 and Westwind Contracting entered into two contracts for the performance of work at Coconut Crossing.  The contracts consisted of Addendums to the standard AIA construction agreement.  IberiaBank Exhs. D, E, F. The first contract provided for the performance of on-site infrastructure work for $4,527,870.00.  Id., Exh. E; Westwind Contracting Exh. 52.  The second contract provided for the performance of off-site work, including widening Coconut Road, for $1,554,903.00.  IberiaBank Exh. F; Westwind Contracting Exh. 51. HG Coconut was not a party to either contract, had no role in the negotiation of the contracts, and had no obligations in the performance or supervision of the contracts.  Westwind Contracting had no direct contract with HG Coconut for the work to be performed by Westwind Contracting under either contract with Coconut 41.

The infrastructure work was to be completed in accordance with engineering plans created by the engineering firm of Hole Montes. Westwind Contracting Exhs. 2, 3-5.  The on-site work included moving fill dirt, and installing sanitary sewers, water mains, drainage, pipes, curbs, and roads.  The off-site work involved widening Coconut Road to accommodate traffic coming in and out of Coconut Crossing.  While the work described in the contracts was to

-8-

be performed predominantly on Development Area 1, the engineering plans called for some work to be performed on Development Area 2, including extending the sewer line to a manhole, stubbing out a waterline, some drainage work, a "bubble-up" structure to help control drainage, and a swale.  Westwind Contracting performed the on-site work on Development Area 2 as depicted in the engineering plans, except that no road was constructed on Development Area 2. Westwind Contracting also coordinated the work it did for Coconut 41 with construction plans prepared by HG Coconut for the future development of HG Coconut's property.

## F. Litigation, Prior Liens, Settlement, and Resumed Infrastructure Work

### (1) Litigation Between HG Coconut and Coconut 41

In 2007, HG Coconut sued Land Development Group and Coconut 41 in state court in connection with the Coconut Crossing project. IberiaBank Exh. G, ¶ H.  HG Coconut alleged that Coconut 41 breached the Land Purchase Contract by selling some of the out-parcels prior to completion of the infrastructure work.

### (2) Liens by Westwind Contracting

Westwind Contracting was not paid for certain work reflected in several pay applications it submitted to Coconut 41, despite a series of inquiries and demands.  Westwind Contracting Exhs. 11, 12, 17, 20, 32.  Westwind Contracting stopped its work, and on or about December 22, 2008, recorded two liens on the Coconut 41

property.   Neither of these liens was filed against HG Coconut's Development Area 2.

**(3) Settlement of Litigation and Infrastructure Work Dispute**

After about two years of litigation, the parties decided to settle the state case and to provide for completion of the infrastructure work.   In March 2009, Westwind Contracting told Coconut 41 the amount which must be paid for it to release its liens and proceed with the infrastructure work.   Westwind Contracting Exhs. 37, 39.   Shortly thereafter, Orion Bank advised Coconut 41 that it was confirming "that there remained sufficient funds available under the Orion Bank commitment to Coconut 41, LLC to fully fund Westwind's Contract to complete the on and off site improvements at Coconut Crossing."   Westwind Contracting Exh. 40. A copy of this confirmation was sent to Westwind Contracting.   Id. Also in March 2009, Coconut 41 confirmed that Westwind Contracting should "remobilize" in order to complete the work, stating that time was of the essence.   Westwind Contracting Exh. 54.

Effective June 29, 2009, HG Coconut, Coconut 41, Land Development Group, and Orion Bank entered into a Settlement and Infrastructure Construction Disbursement Agreement (Settlement and Infrastructure Agreement).   IberiaBank Exh. G.   The Settlement and Infrastructure Agreement settled the litigation between the three litigants and set terms and conditions for the expeditious

completion of Coconut 41's infrastructure work under § 9(a) of the Land Purchase Contract Addendum.  Id., p. 2.

### (a) Litigation Settlement

As to the litigation, HG Coconut had prevailed on summary judgment and ultimately settled the case.  The settlement provided that the state case would be dismissed, and that Coconut 41 would be enjoined from selling any parcels of its property until its obligations under the Land Purchase Contract were complete. Additionally, HG Coconut would receive $185,000 for its attorney fees in two payments:  WPL would be directed to pay HG Coconut $123,333 from the § 9(b) WPL Escrow Account in partial payment of this attorney fees amount, and WPL would later disburse the remaining $61,667 in attorney fees from the § 9(b) WPL Escrow Account to HG Coconut upon execution of the Declaration and the Plat by HG Coconut's mortgagee.  WPL would disburse the remaining balance of the §9(b) WPL Escrow Account to a Construction Draw Account at Orion Bank in the name of Coconut 41.  IberiaBank Exh. G. §§ 2, 4(a)(ii).

### (b) Infrastructure Work

The Settlement and Infrastructure Agreement also defined the remaining infrastructure work needed to be done, including both onsite and road work, and set forth the funding sources to pay for this work.  Id., §§ 3(a), (b); 4(b).

### (i) Remaining Infrastructure Work

As to the onsite infrastructure work, Coconut 41 warranted that all remaining Infrastructure Work to be completed on the Coconut 41 Property and/or the HG Coconut Property, excluding the Coconut Road right-of-way work (the Onsite Work), was itemized in the Schedule B Onsite Specifications and Budget. Coconut 41 estimated that the remaining cost of this work was $999,058.08 (the Onsite Cost). IberiaBank Exh. G. § 3(a)(i). Schedule C to the Settlement Agreement sets forth the estimated schedule for completion of the Onsite Work, with an estimated completion date of September 15, 2009. Id., § 3(a)(ii).

As to the Coconut Road work, Coconut 41 represented that the itemized specifications for all remaining Coconut Road right-of-way work (the Coconut Road Work) was set forth in Schedule B, and that the estimated remaining cost was $490,496.11 (the Coconut Road Cost). Id., § 3(b)(i). The estimated schedule for this work was set forth in Schedule C, with an estimated completion date of August 15, 2009. Id., § 3(b)(ii).

In addition to the Infrastructure Work information, Coconut 41 warranted that Schedule D contained a complete list of all liens filed against the Coconut 41 Property, id., § 3(c)(i), and that Schedule E contained a complete list of all payables for which no liens had been filed, id. § 3(c)(ii). The estimated total amount

needed to pay these items was $229,718.70.  Id., § 3(c)(iii).  Thus the total estimated costs was $1,719,272.89.

### (ii) Funding of Infrastructure Work

The parties agreed that the Total Estimated Infrastructure Cost (the Onsite Cost plus the Coconut Road Cost) was $1,489,554.19.  IberiaBank Exh. G. § 4(a)(i).  The Settlement and Infrastructure Agreement set forth agreed-upon funding sources and mechanisms to pay for this work using the combined funds available under the Orion Bank loan to Coconut 41, and a separate construction draw account.  Id., § 4(a)(ii), (iv).

The first source of funding was the Orion Bank loan to Coconut 41.  Orion Bank warranted that it had sufficient loan funds available within its loan to Coconut 41 and committed for the sole purpose of funding the portion of the Total Estimated Infrastructure Cost which exceeded the §9(b) WPL Escrow Balance (the Loan Portion).  Id., § 4(b)(i).  It was agreed that Orion Bank would disburse draws from the Loan Portion within five days of receipt of a standard application.   Id., § 4(b)(ii).

A second source of funding was a construction draw account. Upon settlement of the state court case, Orion Bank was to establish a Construction Draw Account "in the name of Coconut 41, but controlled exclusively by Orion subject to the terms of this Agreement."  Id., § 4(a)(ii).  This Construction Draw Account was funded by the balance of the §9(b) WPL Escrow Account, which

balance would be deposited into the Construction Draw Account. Id., § 4(a)(iii). The sole purpose of the Construction Draw Account was for "funding the Total Estimated Infrastructure Cost after Orion's disbursement of the Loan Portion". Id., § 4(a)(ii). The Loan Portion was defined as "that portion of the Total Estimated Infrastructure Cost which exceeds the WPL Escrow Balance". Id., § 4(b)(i). The Construction Draw Account "will be used solely for the purpose of funding the 'equity portion' of the Total Estimated Infrastructure Cost." Id., § 4(a)(iv).

Orion Bank warranted that the Loan Portion would be entirely disbursed toward the Total Estimated Infrastructure Cost before any funds were disbursed from the Construction Draw Account toward the Total Estimated Infrastructure Cost. IberiaBank Exh. G. § 4(b)(i). Similarly, Orion Bank agreed that "[a]fter disbursement of all of the Loan Portion . . . Orion shall release draws from the Construction Draw Account" within five days of receipt of a standard Construction Draw Account Application. Id., § 4(b)(iii). Orion Bank agreed to provide a complete copy of each Construction Account Draw Application to counsel for HG Coconut. Id., § 4(b)(iv). The copy of the first such application was to be "accompanied by Orion's certification that all of the Loan Portion has been disbursed in accordance with this Agreement." Id.

If the total cost of the Onsite Work, the Coconut Road Work, the amounts necessary to satisfy and discharge all liens, and the amounts necessary to pay all payables with respect to the

Infrastructure Work exceeded the Total Estimated Infrastructure Cost, Coconut 41 guaranteed to promptly deposit such excess into the Construction Draw Account to be held and disbursed in accordance with the Agreement. Id. § 7.

## G.  Funding of Construction Draw Account

On July 20, 2009, WPL wired transferred $793,000 from the §9(b) Escrow Account to Orion Bank pursuant to Section 2(c) of the Settlement and Infrastructure Agreement. (Doc. #285-9, ¶ 1.) Orion Bank placed the funds into a Coconut 41 "Construction Administration" account which had been in existence since at least August 2007. IberiaBank Exh. I; Doc. #285-9, pp. 4-7. This amount was the ten percent of the purchase price withheld from distribution under the Land Purchase Contract, less amounts paid to HG Coconut pursuant to the Settlement and Infrastructure Agreement. IberiaBank Exh. B Add. § 9(b); Doc. #285-9, ¶ 2; IberiaBank Exh. G, §§ 2(c), 4(a)(iii).

## H. Construction Draw Account Disbursements for Infrastructure Work

Work resumed on the infrastructure work at Coconut Crossing, including work by Westwind Contracting. On July 16, 2009, Coconut 41 executed an Application and Certificate for Payment No. 30 to Orion Bank. IberiaBank Exh. Q. Application No. 30 included $178,343.01 for Coconut Road Work performed by Westwind Contracting. Id., p. 2. On August 13, 2009, Orion Bank issued a Cashier's Check for that amount to Coconut 41 and Westwind

Contracting.   IberiaBank Exh. M.   Funds for this Cashier's Check came from the Coconut 41 Construction Draw Account.   IberiaBank Exh. W; Doc. #285-9, ¶ 3.

On October 1, 2009, Coconut 41 executed an Application and Certificate for Payment No. 31 to Orion Bank.   IberiaBank Exh. R. Application No. 31 was for $9,832.98, for engineering services performed by Hole Montes in connection with Coconut Road Work and On-Site Work.   Id., p. 2.   On October 8, 2009, Orion Bank issued a Cashier's Check for that amount to Coconut 41 and Hole Montes. IberiaBank Exh. L.   Funds for this Cashier's Check came from the Coconut 41 Construction Draw Account.   IberiaBank Exh. V; Doc. #285-9, ¶ 4.

At the times the checks funding Application No. 30 and Application No. 31 were issued, there were funds available under the Coconut 41 Construction Loan from Orion Bank to pay for these amounts.[2]  IberiaBank Exhs. V, W; Doc. #285-9, ¶ 7.

Westwind Contracting asserted that it completed its infrastructure work on or about September 28, 2009.   Westwind Contracting Exh. 44.   By December 2009, Westwind Contracting had not been paid on three pay applications for its work pursuant to the Coconut Road Widening (off-site) contract with Coconut 41.   On or about December 22, 2009, Westwind Contracting recorded a single

---

[2]The loan by Orion Bank to Coconut 41 had a maturity date of August 14, 2009, but that was extended by the bank until December 14, 2009.   HG Coconut Exhs. 14, 18.

Claim of Lien in the amount of $195,554.32 on four properties: Development Area 1 owned by Coconut 41; Development Area 2 owned by HG Coconut; an outparcel owned by Orion Bank; and an outparcel owned by Florida Community Bank. Westwind Contracting Exhs. 44, 49. Westwind Contracting also recorded a Contractor's Final Payment Affidavit for this amount. Westwind Contracting Exh. 48. On January 6, 2010, Westwind Contracting made a formal demand of Coconut 41 for payment of $336,675.38 plus interest. Westwind Contracting Exh. 45. A copy was provided to HG Coconut, Orion Bank, and FDIC, among others. Id., p. 2. Westwind Contracting never submitted any payment applications or invoices to HG Coconut or sought payment from HG Coconut.

I. **Orion Bank Fails, FDIC-R Appointed, IberiaBank Assumption**

In November 2009, Orion Bank failed, closed, and was taken over by the FDIC as Receiver. On November 13, 2009, IberiaBank entered into a Purchase and Assumption Agreement, Whole Bank, All Deposits with the FDIC and the FDIC-R (Purchase Assumption Agreement). IberiaBank Exh. H. Among other things, IberiaBank assumed certain liabilities and purchased certain assets which had once belonged to Orion Bank, including the Construction Administration account. IberiaBank Exh. J.

Other facts will be set forth below as necessary to resolve specific claims.

### III.

The Court will first address Westwind Contracting's claims against HG Coconut, then HG Coconut's claims against Westwind Contracting, and then HG Coconut's claim against IberiaBank.

**A.  Westwind Contracting Claims Against HG Coconut**

Westwind Contracting brings two claims against HG Coconut in its Third Amended Cross-Claim (Doc. #155).  Count I seeks to enforce its Claim of Lien on HG Coconut's Development Area 2. (Doc. #155, ¶¶ 15-30.)  Count Two seeks recovery of $336,675.38 under an unjust enrichment theory for on-site and off-site work, performed under contracts with Coconut 41, but not paid by Coconut 41. (Id., ¶¶ 31-43.)

**(1) Enforcement of Claim of Lien**

Count I seeks to enforce a construction lien for subdivision improvements Westwind Contracting performed pursuant to its off-site contract with Coconut 41.  Westwind Contracting alleges that it first furnished labor, materials, and services on February 18, 2008; that it last furnished such items on September 28, 2009; that Coconut 41 breached the off-site contract by failing to pay $195,554.32 for work performed; and that a Claim of Lien was recorded and served on HG Coconut and others.  Westwind Contracting requested a money judgment of $195,554.32 against HG Coconut.  HG Coconut's Answer (Doc. #170) denied the substance of the claim and raised four affirmative defenses.

On June 10, 2013, Westwind Contracting executed a Release of Recorded Claim of Lien, which included the lien on HG Coconut's property.  This was filed with the Court on August 6, 2013.  (Doc. #345.)

At the conclusion of its case in chief at trial, crossclaim plaintiff Westwind Contracting sought to dismiss Count I pursuant to Fed. R. Civ. P. 41(a)(2).  Cross-defendant HG Coconut objected, and moved for a partial judgment pursuant to Fed. R. Civ. P. 52(c).  The Court took both motions under advisement.

"Generally, a plaintiff may ask the court to dismiss an action at any time."  Anago Franchising, Inc. v. Shaz, LLC, 677 F.3d 1272, 1276 (11th Cir. 2012)(citing Fed. R. Civ. P. 41(a)(2)).  Rule 41(a)(2) permits a plaintiff to voluntarily dismiss an action "only by court order, on terms that the court considers proper."  Fed. R. Civ. P. 41(a)(2).  "The district court enjoys broad discretion in determining whether to allow a voluntary dismissal under Rule 41(a)(2)."  Pontenberg v. Boston Scientific Corp., 252 F.3d 1253, 1255 (11th Cir. 2001)(citation omitted).  "[I]n most cases a dismissal should be granted unless the defendant will suffer clear legal prejudice, other than the mere prospect of a subsequent lawsuit, as a result."  McCants v. Ford Motor Co., Inc., 781 F.2d 855, 856-57 (11th Cir. 1986).  In the Eleventh Circuit, however, a plaintiff can only seek to dismiss its entire action and cannot pick and choose which claims are to be dismissed.  Campbell v.

Altec Indus., Inc., 605 F.3d 839, 841 (11th Cir. 2010)(citing Klay
v. United Healthgroup, Inc., 376 F.3d 1092, 1106 (11th Cir. 2004)).

Westwind Contracting's motion to dismiss Count I pursuant to
Fed. R. Civ. P. 41(a)(2) is **DENIED**.   The motion is inappropriate
under Eleventh Circuit precedent because it seeks to dismiss only
a portion of the action, not the entire action.   Even if such a
motion was allowed, the Court would exercise its discretion and
deny the motion.   The case has been actively litigated since its
inception in June 2011.   The Claim of Lien was released prior to
trial, in June 2013.   Westwind Contracting did not seek dismissal
until after completion of all discovery, pretrial proceedings, and
presentation of its evidence in chief at trial.   Westwind
Contracting has offered no reason for making its motion so late in
the proceedings, and indeed has offered no justification at all for
the motion.   The Court finds no equities which favor Westwind
Contracting's dismissal, and finds that dismissal at this stage of
the proceedings would result in great prejudice to HG Coconut.

HG Coconut's motion for a judgment on partial findings
pursuant to Fed. R. Civ. P. 52(c)[3] is **GRANTED** as to Count I.   "A
Rule 52(c) motion may be granted if. . . based on the evidence
before it, the court finds, after resolving the credibility issues

---

[3]Under Rule 52(c), if a party has been fully heard on an issue
during a nonjury trial, the Court may enter judgment against the
party on a claim or defense supported by findings of fact and
conclusions of law.

and weighing the evidence, for the defendant." Denson v. United States, 574 F.3d 1318, 1334 n.48 (11th Cir. 2009). "In addressing a Rule 52(c) motion, the court does not view the evidence in the light most favorable to the nonmoving party, as it would in passing on a Rule 56 motion for summary judgment or a Rule 50(a) motion for judgment as a matter of law; instead, it exercises its role as factfinder." United States v. $242,484.00 in U.S. Currency, 389 F.3d 1149, 1172 (11th Cir. 2004). Under Rule 52(c), "the court must weigh the evidence and may consider the witnesses' credibility." Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1504 (11th Cir. 1993).

Westwind Contracting does not argue that its evidence established the necessary factual predicate to support Count I. Indeed, as Westwind Contracting's counsel stated at the conclusion of its case, Westwind Contracting "has no intention of and has not put on any evidence in support of" its count to foreclose the Claim of Lien. The Court agrees, and finds that Westwind Contracting has not done so. Accordingly, the Court finds that HG Coconut is entitled to a judgment in its favor as to Count I of the Third Amended Cross Claim, and Westwind Contracting shall take nothing on this count.

### (2) Unjust Enrichment

In Count II, Westwind Contracting pleads a claim of unjust enrichment as an alternative to Count I. Westwind Contracting

asserts that HG Coconut should pay the amounts Westwind Contracting is still owed under its contracts with Coconut 41 because HG Coconut has been benefitted by that work.  Westwind Contracting claims that it is owed $141,121.06 for on-site work, Westwind Contracting Exh. 46, and $195,544.32 for off-site work, Westwind Contracting Exh. 47.  HG Coconut's Answer (Doc. #170) denied the substance of the claim, and raised affirmative defenses that the work was not completed and that Westwind Contracting waived the right to assert the claim.

"In Florida, a claim for unjust enrichment is an equitable claim based on a legal fiction which implies a contract as a matter of law even though the parties to such an implied contract never indicated by deed or word that an agreement existed between them." 14th & Heinberg, LLC v. Terhaar & Cronley Gen. Contractors, Inc., 43 So. 3d 877, 880 (Fla. 1st DCA 2010).  "Unjust enrichment cannot apply where an express contract exists which allows the recovery." Atlantis Estate Acquisitions, Inc. v. DePierro, ___ So. 3d ___, 2013 WL 1748642, at *4 (Fla. 4th DCA Apr. 24, 2013).  The evidence established that there is no contract between Westwind Contracting and HG Coconut for the on-site or off-site infrastructure work, and therefore a claim of unjust enrichment may be presented.

A claim of unjust enrichment requires Westwind Contracting to show by at least a preponderance of the evidence that (1) Westwind Contracting conferred a direct benefit on HG Coconut, (2) HG Coconut had knowledge of the benefit, (3) HG Coconut accepted or

retained the conferred benefit, and (4) the benefit was conferred under circumstances which make it inequitable for HG Coconut to retain the benefit without paying its fair value. Resnick v. AvMed, Inc., 693 F.3d 1317, 1328 (11th Cir. 2012); CMH Homes, Inc. v. LSFC Co., LLC, 118 So. 3d 964, 965 (Fla. 1st DCA 2013); Kopel v. Kopel, 117 So. 3d 1147, 1152 (Fla. 3d DCA 2013); Malamud v. Syprett, 117 So. 3d 434, 437 (Fla. 2d DCA 2013). Unjust enrichment "acknowledges an obligation which is imposed by law regardless of the intent of the parties." Circle Fin. Co. v. Peacock, 399 So. 2d 81, 84 (Fla. 1st DCA 1981)(citation omitted). The proper measure of damages in a situation such as this case is the amount unpaid on the contract between Westwind Contracting and Coconut 41. 14th & Heinberg, 43 So. 3d at 880-82.

**(a) Conferred Direct Benefit**

"It is axiomatic that there must be a benefit conferred before unjust enrichment exists." Henry M. Butler, Inc. v. Trizec Props., Inc., 524 So. 2d 710, 712 (Fla. 2d DCA 1988). This must be a direct benefit. Malamud, 117 So. 3d at 438. The evidence establishes that Westwind Contracting conferred a direct benefit on HG Coconut. The infrastructure work performed by Westwind Contracting was a necessary prerequisite for HG Coconut to obtain required governmental permits to develop Development Area 2 in the future; the work would allow HG Coconut to tie into sewer lines constructed by Westwind Contracting; it allowed physical access to

Development Area 2; it constructed a wider Coconut Road, which would allow better access to Development Area 2; and some of the work was physically constructed on HG Coconut's Development Area 2.

### (b) HG Coconut's Knowledge of the Benefit

HG Coconut had express knowledge of the work by Westwind Contracting and the benefit it provided to HG Coconut.  The Land Purchase Contract obligated Coconut 41 to make such improvements to the land, and explicitly acknowledged the benefits to HG Coconut. Indeed, HG Coconut sued Coconut 41 to ensure completion of the infrastructure work prior to the sale of out-parcels.  As Mr. Leve testified at trial, given the nature of the work it was obviously not a secret that such work was being performed.  Additionally, Mr. Leve testified that the development plans created by HG Coconut for Development Area 2 were used by Westwind Contracting in developing and coordinating its work on Coconut Crossing.

### (c) HG Coconut Accepted or Retained the Conferred Benefit

The evidence establishes that HG Coconut accepted and retained the conferred benefit.  HG Coconut had some of the work physically done on its property, and it has the ability to connect to the sewer lines as contemplated by the Land Purchase Contract.  Mr. Leve testified that the future development of Development Area 2 was dependent upon the performance of the infrastructure work on Development Area 1.  The widening of Coconut Road was a condition of Lee County's approval of the development of both Development

Area 1 and Development Area 2, and development of Development Area 2 could not proceed without the Coconut Road widening. Utilities that will be installed on Development Area 2 will tap into or hook up to the utilities on Development Area 1. HG Coconut never directed Westwind Contracting to cease performing work, and indeed wanted the work to be performed (although paid for by Coconut 41).

The Court rejects HG Coconut's argument at trial that in order to accept or retain a benefit, HG Cooncut must "be in somewhat control of the direction of the work." The law simply does not require the benefitted party to have been in some degree of control in order for it to accept or retain the benefit.

### (d) Inequitable to Retain Without Paying Fair Value

The work performed by Westwind Contracting provided permanent and valuable future benefits to HG Coconut. The Court finds that it would be inequitable to allow HG Coconut to retain the benefits conferred upon it without paying fair value for the amount which remains unpaid to Westwind Contracting. Westwind Contracting Exhibit 46 establishes an outstanding amount of $141,121.06 owing for unpaid work under the on-site contract, and Westwind Contracting Exhibit 47 establishes an outstanding amount of $195,544.32 for unpaid work under the off-site contract. The Court finds that $336,665.38 is the fair value that should be paid by HG Coconut, subject to resolution of the affirmative defenses discussed below.

### (e) Affirmative Defenses

HG Coconut raised two affirmative defenses applicable to the unjust enrichment claim.

### (i) Incomplete Work

HG Coconut asserts as its Fifth Affirmative Defense that the unjust enrichment claim is barred because the work required under the on-site and off-site contracts was not completed. HG Coconut relies upon Edd Helms Elec. Contracting, Inc. v. Barnett Bank of S. Fla., N.A., 531 So. 2d 238, 239 (Fla. 3d DCA 1988), which dismissed an unjust enrichment count on the pleadings stating "[u]njust enrichment cannot be established by alleging merely 'substantial completion.' See J.G. Plumbing Svc., Inc., 329 So. 2d at 395 (no unjust enrichment where default occurs prior to completion of construction)". (Doc. #170, p. 9.)

The Court finds that neither Edd Helms nor J.G. Plumbing[4] govern this case. Unlike Edd Helms, this case is far beyond the pleading stage; additionally, the specific issue in J.G. Plumbing is not involved in this case. Rather, the principles articulated in Casa Linda Tile & Marble Installers, Inc. v. Highlands Place 1981 Ltd., 642 So. 2d 766 (Fla. 4th DCA 1994) govern. "When a contractor has substantially performed and otherwise complied with the mechanic's lien statute, it is entitled to an award on its

---

[4]J.G. Plumbing Serv., Inc. v. Coastal Mortg. Co., 329 So. 2d 393 (Fla. 2d DCA 1976).

mechanic's lien claim for the contract price less all damages caused by its failure to render full performance." Casa Linda, 642 So. 2d at 768 (citing Fleming v. Urdl's Waterfall Creations, Inc., 549 So. 2d 1057 (Fla. 4th DCA 1989); Viking Communities Corp. v. Peeler Constr. Co., 367 So. 2d 737 (Fla. 4th DCA 1979); Ocean Ridge Dev. Corp. v. Quality Plastering, Inc., 247 So. 2d 72 (Fla. 4th DCA 1971)). Substantial performance is defined as "that performance of a contract which, while not full performance, is so nearly equivalent to what was bargained for that it would be unreasonable to deny the promisee the full contract price subject to the promisor's right to recover whatever damages may have been occasioned him by the promisee's failure to render full performance." Casa Linda, at 768 (quoting Ocean Ridge, 247 So. 2d at 75). The Court finds no reason to apply a different rule where recovery is sought under an unjust enrichment theory.

The work performed by Westwind Contracting that was the subject of the unjust enrichment claim was substantially completed. Westwind Contracting concedes that it still has to complete the thermoplastic striping for Coconut Road under the off-site contract, as well as some items on a punch list by Hole Montes. Elizabeth D'Jamoos (Ms. D'Jamoos), a managing member of Coconut 41 who was involved in the Coconut Crossing project on its behalf, testified at trial that the off-site work that remained was very minor cleanup and punch list work. Westwind Contracting estimated that this would cost $20,000 at the most to complete. HG Coconut

therefore fails on its Fifth Affirmative Defense, but the $20,000 cost of the remaining work will be offset against the amount due under the unjust enrichment claim.

### (ii) Waiver

HG Coconut's Sixth Affirmative Defense asserts that Westwind Contracting has waived its right to assert claims for damages pursuant to §13.3 of the on-site and off-site contracts with Coconut 41. (Doc. #170, pp. 9-10.) Section 13.3 states:

> [Westwind Contracting] shall not be entitled to any claim for damages on account of hindrance or delays from any cause whatsoever, but if occasioned by an act of god, or by act or omission or on the part of [Coconut 41], such act, hindrance , or delay may only entitle [Westwind Contracting] to receive an extension of time . . . as its sole and exclusive remedy.

Westwind Contracting Exhs. 51 & 52, p. 5, § 13.3.

The evidence in this cases establishes that Westwind Contracting is seeking damages not "on account of hindrance or delays", but damages resulting from non-payment of work performed. Section 13.3 is simply not applicable to the claim in this case. The Court finds that the Sixth Affirmative Defense is without merit.

### (f) Prejudgment Interest

"The Supreme Court of Florida has held that a plaintiff is entitled to prejudgment interest as a matter of law." SEB S.A. v. Sunbeam Corp., 476 F.3d 1317, 1320 (11th Cir. 2007)(citing Argonaut Ins. Co. v. May Plumbing Co., 474 So. 2d 212, 215 (Fla. 1985).

Specifically, a plaintiff is entitled to prejudgment interest on an unjust enrichment claim. Montage Grp., Ltd. v. Athle-Tech Computer Sys., Inc., 889 So. 2d 180, 199 (Fla. 2d DCA 2004). Prejudgment interest accrues from the date of the loss, or accrual of cause of action, is an element of damages, until final judgment is rendered. Bel-Bel Intern. Corp. v. Cmty. Bank of Homestead, 162 F.3d 1101, 1110 (11th Cir. 1998); Bosem v. Musa Holdings, Inc., 46 So. 3d 42, 46 (Fla. 2010); Argonaut, 474 So. 2 at 215. In this case, Westwind Contracting prevailed on Count II of its Third Amended Cross-Claim (Doc. #155) for unjust enrichment against HG Coconut. The Court finds that the date of loss is calculated from when HG Coconut had notice of a demand for payment from Westwind Contracting.

**(1) Offsite Work**

A Claim of Lien in the amount of $195,554.32 was recorded on the property of HG Coconut, and others, on December 22, 2009. Westwind Contracting Exh. 49. Westwind Contracting sent a letter dated December 28, 2009, by Certified Mail Return Receipt to HG Coconut with the attached Claim of Lien. Westwind Contracting Exh. 44. Mr. Robert Parks testified that Westwind Contracting provided no prior notice to HG Coconut that payment was expected or demanded until Westwind Contracting's counsel sent the December 28, 2009 letter. No testimony was presented as to when the package was actually received by HG Coconut, but it is undisputed that it was

received.[5]  The normal delivery time for certified mail is 1 to 3 days depending on whether counsel used Priority Mail or First-Class Mail.[6]  See https://www.usps.com/business/add-extra-services.htm? Therefore, the letter demanding $195,554.32 for offsite work was received by HG Coconut on or about December 31, 2009.  No notice or reference in the letter was provided or made with regard to the $141,121.06 balance for onsite work as of this date.

### (2) Onsite Work

A formal demand for payment of the unpaid payment applications totaling $336,675.38 was made by counsel for Westwind Contracting in a letter dated January 6, 2010, directed at Coconut 41.  HG Coconut Exh. 45.  HG Coconut was copied on the letter but the demand was not directed at HG Coconut.  The Contractor's Final Payment Affidavit as to the $141,121.06 was provided to Coconut 41 on June 30, 2010.  HG Coconut Exh. 70.  The undisputed testimony at trial was that no such Affidavit was provided to HG Coconut.

The unjust enrichment claim, seeking the total for the onsite and offsite work was initially asserted against HG Coconut by Westwind Contracting on March 17, 2010, in the 20th Judicial Circuit Court, in and for Lee County, Florida.  (See Doc. #4.)  HG

---

[5]A letter dated February 11, 2010 from HG Coconut to IberiaBank and the FDIC specifically references the December 28, 2009 letter.  HG Coconut Exh. 25.  Therefore, the letter was received at least prior to this date.

[6]In its Answer, HG Coconut admitted that it received a copy of the Claim of Lien but stated it was without knowledge whether the receipt was via certified mail.  (Doc. #170, ¶26.)

Coconut was served with the Counterclaim, Crossclaim, and Third-Party Complaint (Do. #4) on March 31, 2010, and the Summons was returned on April 12, 2010.  Therefore, the Court finds that HG Coconut had notice of a demand for the additional $141,121.06, for onsite work on or about April 12, 2010.

### (3) Applicable Rate

In the absence of a special contract for the rate, the applicable rate of interest is generally stated in Florida Statute Section 55.03.  Fla. Stat. § 687.01.  The pre-judgment interest is the rate effective at the time of entitlement.  Genser v. Reef Condo. Ass'n, Inc., 100 So. 3d 760, 762 (Fla. 4th DCA 2012); Regions Bank v. Maroone Chevrolet, LLC, 118 So. 3d 251, 257-258 (Fla. 3d DCA 2013).  Effective June 26, 2003 to June 30, 2011, the interest rate remained the same until paid.  Fla. Stat. § 55.03(3)(2003).  Effective July 1, 2011 and currently, the interest rate adjusts annually on January 1 of each year until paid, and the rate is adjusted quarterly.  Fla. Stat. § 55.03(1), (3)(2011).  In this case, both dates of loss occurred prior to the effective date of the current version of Fla. Stat. § 55.03, and therefore the applicable rate does not adjust through the date of judgment.  The Court finds that the appropriate rates, as established by the Chief Financial Officer for the State of Florida, are 8% (effective December 31, 2009) as to the offsite work total ($195,554.32 – $20,000 = $175,554.32) and 6% (effective April 12, 2010) as to the

onsite work total ($141,121.06) calculated as follows through the date of Judgment to be entered as of the date of this Opinion and Order, November 18, 2013:

| Amount of Damages | Daily Rate | Number of Days | Total |
|---|---|---|---|
| $175,554.32 | 0.0002192 | 1418 days (from 12/31/2009) | $54,566.77 |
| $141,121.06 | 0.0001644 | 1316 days (from 04/12/2010) | $30,531.59 |
| Prejudgment Total | | | **$85,098.36** |

### (g) Summary of Disposition of Westwind Contracting Claims

For the reasons set forth above, the Court denies Westwind Contracting's motion to dismiss Count I of its Third Amended Cross-Claim (Doc. #155), and grants HG Coconut's motion for partial judgment as to Count I of the Third Amended Cross-Claim.  Westwind Contracting shall take nothing from HG Coconut as to Count I.  As to Count II, judgment shall enter in favor of Westwind Contracting and against HG Coconut in the amount of $316,665.32 ($336,665.32 less $20,000) plus prejudgment interest ($85,098.36) for a total of $401,763.68.

### B.  HG Coconut Claims Against Westwind Contracting

HG Coconut brings three affirmative claims against Westwind Contracting in its Counter-Crossclaim (Doc. #170, pp. 10-18).  Count I alleges a claim for a fraudulent lien under Fla. Stat. § 713.31.  Count II alleges slander of title based upon the recording

of the Claim of Lien. Count III asserts a claim for conversion in connection with the $178,343.01 released by Orion Bank to Westwind Contracting pursuant to Construction Draw No. 30.

**(1) Fraudulent Lien**

Count I of HG Coconut's Counter Crossclaims (Doc. #170, pp. 10-13) seeks damages against Westwind Contracting pursuant to Fla. Stat. § 713.31 for filing a fraudulent lien against HG Coconut's Development Area 2.  HG Coconut contends that the $195,554.32 lien Westwind Contracting filed against its Development Area 2 property was fraudulent because (a) Westwind Contracting willfully exaggerated the amount of the Claim of Lien to include amounts unrelated to off-site work, for work not yet completed, or for work already paid for by Coconut 41 on its property; and (b) Westwind Contracting furnished no labor, material or services on property owned by HG Coconut.  Alternatively, HG Coconut claims that if any work benefitted HG Coconut, the amount of the lien was grossly exaggerated.  Westwind Contracting denies the claim, and asserts affirmative defenses of good faith and advice of counsel.  (Doc. #215, ¶¶ 56, 57.)

**(a) Relevant Florida Statutes**

A contractor such as Westwind Contracting, which performs subdivision improvements making real property suitable as a site of

an improvement[7], is entitled to a lien on the real property if it is not paid for its work.

> Any lienor who, regardless of privity, performs services or furnishes material to real property for the purpose of making it suitable as the site for the construction of an improvement or improvements shall be entitled to a lien on the real property for any money that is owed to her or him for her or his services or materials furnished in accordance with her or his contract and the direct contract. The total amount of liens allowed under this section shall not exceed the amount of the direct contract under which the lienor furnishes labor, materials, or services.

Fla. Stat. § 713.04(1). A contractor may not, however, file a fraudulent lien against property. A fraudulent lien is defined as follows:

> Any lien asserted under this part in which the lienor has willfully exaggerated the amount for which such lien is claimed or in which the lienor has willfully included a claim for work not performed upon or materials not furnished for the property upon which he or she seeks to impress such lien or in which the lienor has compiled his or her claim with such willful and gross negligence as to amount to a willful exaggeration shall be deemed a fraudulent lien.

Fla. Stat. § 713.31(2)(a). HG Coconut has the burden of establishing that the lien in this case was a fraudulent lien. Sam

---

[7]"The work of making real property suitable as the site of an improvement shall include but shall not be limited to the grading, leveling, excavating, and filling of land, including the furnishing of fill soil; the grading and paving of streets, curbs, and sidewalks; the construction of ditches and other area drainage facilities; the laying of pipes and conduits for water, gas, electric, sewage, and drainage purposes; and the construction of canals and shall also include the altering, repairing, and redoing of all these things." Fla. Stat. § 713.04(1).

Rodgers Props., Inc. v. Chmura, 61 So. 3d 432, 439-40 (Fla. 2d DCA 2011).

**(b) Fraudulent Lien Law**

Florida law provides two forms of statutory relief for filing a fraudulent lien.  First, a fraudulent lien is unenforceable. Sharrard v. Ligon, 892 So. 2d 1092, 1096 (Fla. 2d DCA 2004). Establishing a lien is fraudulent is a complete defense to any action to enforce the lien, and a fraudulent lien is to be declared unenforceable with the lienor to forfeit any right to lien the property.  Fla. Stat. § 713.31(2)(b).  "However, a minor mistake or error in a claim of lien, or a good faith dispute as to the amount due does not constitute a willful exaggeration that operates to defeat an otherwise valid lien."  Fla. Stat. § 713.31(2)(b).

Second, the owner of the improperly liened property is given the right to file an action for damages occasioned by the fraudulent lien against a contractor who files a fraudulent lien. Fla. Stat. § 713.31(2)(c); Sharrard, 892 So. 2d at 1096. Recoverable damages include:

> court costs, clerk's fees, a reasonable attorney's fee and costs for services in securing the discharge of the lien, the amount of any premium for a bond given to obtain the discharge of the lien, interest on any money deposited for the purpose of discharging the lien, and punitive damages in an amount not exceeding the difference between the amount claimed by the lienor to be due or to become due and the amount actually due or to become due.

Fla. Stat. § 713.31(2)(c).  Additionally, the prevailing party in such a claim may recover reasonable attorney fees and costs.  Id.

"A claim of lien that overstates the amount claimed is not necessarily fraudulent, unless the exaggeration is made willfully." Sam Rodgers Props., 61 So. 3d at 440.  A mistake in the computation of the amount of the lien is not necessarily a willful exaggeration, and a trial court which reduces the amount of a lien does not necessarily find a willful exaggeration.  Politano v. GPS Const. Grp., 9 So. 3d 15 (Fla. 3d DCA 2008).  On the other hand, a trial court can determine that a lien is fraudulent notwithstanding a good faith dispute as to the amount owed under a contract. Medellin v. MLA Consulting, Inc., 69 So. 3d 372, 374 (Fla. 5th DCA 2011).  "A lienor's exaggeration of the amount of a claim of lien by the inclusion of 'amounts which are not recoverable under the contract, are not authorized, or are arbitrary' renders the lien fraudulent and unenforceable."  Sharrard v. Ligon, 892 So. 2d at 1099 (citations omitted).

Because an exaggeration must be willful to be fraudulent, "the lienor's consultation with independent counsel prior to filing the claim of lien is a factor to be considered along with other pertinent factors."  Id. at 1097 (citations omitted).  However, "a lienor can rely on consultation with counsel prior to filing the claim of lien as evidence of good faith only in the event of a full and complete disclosure of the pertinent facts to the attorney from

whom the advice is sought before the lienor acts on the advice."
Id.  Consultation with an attorney is not entitled to any legal
weight if the contractor did not disclose all pertinent facts to
the attorney.  Id.

### (c) Application To This Case

The evidence establishes that Westwind Contracting filed a
Claim of Lien against Development Area 2 (and other property) dated
December 22, 2009, in the amount of $195,554.32 for work performed
under its Coconut Road Widening contract with Coconut 41.  In the
Claim of Lien, Mr. Parks, as Executive Vice President of Westwind
Contracting, swore that Westwind Contracting furnished labor,
services, and materials consisting of improvements to Coconut Road
for the benefit of four parcels of real property, one of which was
HG Coconut's Development Area 2.  Westwind Contracting Exh. 49.  In
the Contractor's Final Payment Affidavit, Marion Mosely, President
of Westwind Contracting, swore that pursuant to a contract with
Coconut 41, Westwind Contracting had "furnished labor, material and
services for the construction of certain improvements to real
property as more particularly set forth in said contract," that the
final payment amount was $195,554.32, and that all work performed
under the contract "has been fully completed, or would have been
performed except for the termination of the contract".  Westwind
Contracting Exh. 48.

HG Coconut's assertion in the Counter Crossclaim that there was no work performed on Development Area 2 has been proven incorrect.  The credible testimony established that there was work physically performed on Development Area 2, as summarized above.  Additionally, there was no credible evidence at trial that the amount of the lien included amounts unrelated to the offsite work, or amounts which had already been paid.

Nonetheless, the Court finds that filing a single lien for the full amount due on property which included Development Area 2 was inappropriate in this case.  A single claim of lien was not appropriate under Fla. Stat. § 713.09 because the properties were owned by different owners.  See Fla. Stat. § 713.09 ("[T]he owner under the direct contract must be the same person for all lots, parcels, or tracts of land against which a single claim of lien is recorded.").  The Court further finds that the amount of the lien was willfully exaggerated as to Development Area 2.  As Westwind Contracting later admitted, HG Coconut's pro-rata share of the lien was only $61,540.94, and not $195,554.  HG Coconut Exh. 54, Answer ¶ 3.  While Mr. Parks testified Westwind Contracting provided its counsel with the contracts, the payouts, and the payments supplied, he further testified he did not recall whether counsel was told that HG Coconut was the sole owner of Development Area 2, or that Coconut 41 owned no interest in Development Area 2, or that Westwind Contracting did not serve a contractor's final affidavit on HG Coconut, or if there were other documents provided to

counsel.  Thus, while having an attorney prepare and file the claim of lien is a factor, the Court cannot find that full and complete information was given to counsel sufficient to undermine willfulness.  The Claim of Lien was for the total amount owing for offsite work even though Westwind Contracting knew that only a substantially lesser amount was apportionable to HG Coconut.

"It is axiomatic that a plaintiff must prove damages resulting from the defendant's wrongdoing to be entitled to recover" and evidence regarding a "reasonable certainty" as to the amount of damages.  Regions Bank v. Maroone Chevrolet, LLC, 118 So. 3d 251, 257 (Fla. 3d DCA 2013).  Such evidence was not forthcoming in this case.  There was no evidence that HG Coconut incurred court costs, clerk's fees, a reasonable attorney's fee, or costs for services in securing the discharge of the lien.  There was no bond given to obtain the discharge of the lien, and no money deposited for the purpose of discharging the lien.  There is insufficient evidence to support punitive damages.  Therefore, HG Coconut has failed to establish its claim for fraudulent lien.  Judgment shall enter in favor of Westwind Contracting as to Count I of HG Coconut's Counter Crossclaim.

**(3) Slander of Title**

In Count II, HG Coconut states a claim for slander of title against Westwind Contracting based upon its recording of the Claim of Lien against Development Area 2 in the public record.  HG

Coconut asserts that the Claim of Lien communicated that Westwind Contracting had performed work on property owned by HG Coconut that had not been paid in full, and disparaged HG Coconut's title because a lien is an encumbrance making the property unmarketable and reducing its value. HG Coconut further alleges that it incurred attorney fees to remove the slander to its title, and that such attorney fees are special damages which must be reimbursed. (Doc. #170, ¶¶ 21-28.) Westwind Contracting denies the substance of the claim, and asserts affirmative defenses of good faith, advice of counsel, and a prior encumberance by an unrelated a mortgage. (Doc. #215.)

In Florida, "slander of title" and "disparagement" of title are interchangeable terms for the same cause of action. Old Plantation Corp. v. Maule Indus., Inc., 68 So. 2d 180, 181 (Fla. 1953); Callaway Land & Cattle Co., Inc. v. Banyon Lakes C. Corp., 831 So. 2d 204, 207 n.1 (Fla. 4th DCA 2002). The elements of slander of title are that: "(1) A falsehood (2) has been published, or communicated to a third person (3) when the defendant-publisher knows or reasonably should know that it will likely result in inducing others not to deal with the plaintiff and (4) in fact, the falsehood does play a material and substantial part in inducing others not to deal with the plaintiff; and (5) [actual and/or] special damages are proximately caused as a result of the published falsehood." McAllister v. Breakers Seville Ass'n, Inc., 981 So. 2d 566, 573 (Fla. 4th DCA 2008)(citations omitted). See also

Residential Communities of Am. v. Escondido Cmty. Ass'n, 645 So. 2d 149, 150 (Fla. 5th DCA 1994)(applying elements). "[A]ttorney's fees in slander of title cases are considered 'special damages.'" Price v. Tyler, 890 So. 2d 246, 250 (Fla. 2004)(citation omitted).  Both the amount and the reasonableness of the attorney fees, however, must be established to the trier of fact.  Fraser v. Security & Inv. Corp., 615 So. 2d 841, 842 (Fla. 4th DCA 1993); Aspen Inv. Corp. v. Holzworth, 587 So. 2d 1374, 1377 (Fla. 4th DCA 1991).

"Even if these factors are met, if an affirmative defense of privilege is raised, the burden shifts to the plaintiff to prove actual malice in order to recover." McAllister, 981 So. 2d at 574 (citations omitted).  "The affirmative defense of good faith raises a privilege and creates a factual issue as to the existence of malice." Id.  See also Residential Communities of Am., 645 So. 2d at 150.

**(a) A Falsehood**

The Claim of Lien was recorded and stated under oath that $195,554.32 was unpaid and owed pursuant to the contract with Coconut 41, LLC for improvements to Coconut Road and for the benefit of HG Coconut's property.  The evidence established that although HG Coconut benefitted from work completed on Development Area 2, HG Coconut was never contractually obligated to pay for the completed offsite work and did not receive notice before the Claim of Lien was filed against HG Coconut's property.  The evidence also

established that the amount of the lien attributable to HG Coconut was substantially lower than the total Claim of Lien asserted on HG Coconut's property.  As reflected in answers to interrogatories, Westwind Contracting was not entitled to the total amount of the lien from HG Coconut.  Also, the Claim of Lien was released by Westwind Contracting just weeks before trial.  The Court finds that HG Coconut has established that the claim of lien was substantively false, and thus the first element of the slander of title claim has been established.

**(b) Published or Communicated to a Third Person**

"The plaintiff in a slander of title action must prove that the defendant published the alleged defamatory statement to a third party." Tishman-Speyer Equitable S. Fla. Venture v. Knight Invs., Inc., 591 So. 2d 213, 214 (Fla. 4th DCA 1991).  It is undisputed that the Claim of Lien on HG Coconut's property was recorded with the Lee County Clerk of Circuit Court on December 22, 2009.  The Claim of Lien was improper in the "substantive sense", Bothmann v. Harrington, 458 So. 2d 1163, 1168-69 (Fla. 3d DCA 1984), and therefore the recording of the lien was a publication to a third person that there were unpaid amounts due on a contract for improvements to the property. McAllister, 981 So. 2d at 574 ("The second factor, publication, is met by the recording of the lien.") The Court finds that HG Coconut has established the element of publication to a third party for its slander of title claim.

### (c) Knowledge

The recording of the Claim of Lien must occur when Westwind Contracting knew or reasonably should have known that it would likely result in inducing others not to deal with HG Contracting. No testimony was offered that the recorded lien caused anyone not to deal with HG Coconut, or to show that Westwind Contracting recorded the lien reasonably knowing that it would have that effect. While a lien operates as a cloud on title, the undisputed testimony by Mr. Leve was that an unrelated mortgage remained on the HG Coconut property for a substantially greater amount of money. The Court finds the knowledge element for a slander of title claim has not been established.

### (d) Material and Substantial

The false Claim of Lien must in fact play a material and substantial part in inducing others not to deal with HG Coconut. As noted, there was no evidence presented that there were others who did not deal with HG Coconut. Development Area 2 had a recorded mortgage against it since its purchase by HG Coconut in 2005. HG Coconut authorized this mortgage to be recorded, and recognizes it as a legitimate debt. HG Coconut never had a contract to sell the property or parts of the property, and never attempted to transfer the property. This fourth element of a slander of title claim has not been established.

**(e) Damages, Special Damages**

Finally, HG Coconut must establish actual damages and/or special damages which proximately caused by the recording of the false Claim of Lien. <u>Residential Communities</u>, 645 So. 2d at 150. The slander of title count specifically pled that HG Coconut suffered damages (Doc. #170, p. 13, ¶27), including attorneys fees to remove the claim of lien (<u>id.</u>, p. 13, ¶ 28).  The evidence at trial, however, did not establish that HG Coconut suffered any actual damages resulting from the filing of the claim of lien. Similarly, plaintiff must prove special damages such as attorney fees as an essential element in the cause of action.  <u>Bothmann v. Harrington</u>, 458 So. 2d 1163, 1170 (Fla. 3d DCA 1984). While it is clear that HG Coconut incurred attorney fees in attempting to remove the Claim of Lien, there was no testimony at trial as to the amount of the attorney fees incurred, or as to the reasonableness of the attorney fees.  Such evidence is required to establish these special damages. <u>Fraser</u>, 615 So. 2d at 842-43; <u>Aspen Inv. Corp.</u>, 587 So. 2d at 1377.

The Court finds that HG Coconut has not establish its claim of slander of title against Westwind Contracting.  Therefore, judgment shall be entered in favor of Westwind Contracting and HG Coconut shall take nothing on this count.

**(3) Conversion**

In Count III, HG Coconut alleges that Westwind Contracting converted funds when it received $178,343.01 from Orion Bank pursuant to Construction Draw No. 30.  HG Coconut asserts that Orion Bank was contractually bound to have used the loan proceeds instead of money in the Construction Draw Account to pay Draw No. 30, and that Westwind Contracting was never entitled to receive or retain those particular funds.  While HG Coconut admits that Westwind Contracting did not learn of Orion Bank's misappropriation of the funds until during the course of this litigation, HG Coconut asserts that Westwind Contracting's refusal to return the funds to HG Coconut upon demand subjects it to liability for conversion. (Doc. #170, pp. 14-18.)

"In order to establish a claim for conversion of money under Florida law, a plaintiff must demonstrate, by a preponderance of the evidence: (1) specific and identifiable money; (2) possession or an immediate right to possess that money; (3) an unauthorized act which deprives plaintiff of that money; and (4) a demand for return of the money and a refusal to do so."  United States v. Bailey, 288 F. Supp. 2d 1261, 1264 (M.D. Fla. 2003)(citations omitted), aff'd, 419 F.3d 1208 (11th Cir. 2005).  "The essence of conversion, however, is not the possession of property by the wrongdoer, but rather such possession in conjunction with a present intent on the part of the wrongdoer to deprive the person entitled

-45-

to possession of the property." Brand v. Old Republic Nat'l Title Ins. Co., 797 So. 2d 643, 646 (Fla. 3d DCA 2001).   Withdrawing money from an account and exercising wrongful dominion and control over the money is an act of conversion.  Allen v. Gordon, 429 So. 2d 369, 371 (Fla. 1st DCA 1983).   Additionally, an entity which retains improperly disbursed escrow funds can be liable for conversion.  Goodwin v. Alexatos, 584 So. 2d 1007, 1011 (Fla. 5th DCA 1991).

**(a) Specific and Identifiable Money**

"For money to be the object of conversion there must be an obligation to keep intact or deliver the specific money in question, so that money can be identified."  Gasparini v. Pordomingo, 972 So. 2d 1053, 1056 (Fla. 3d DCA 2008)(internal quotation marks and citations omitted).  See also Walker v. Figarola, 59 So. 3d 188, 190 (Fla. 3d DCA 2011)(same).   The evidence establishes that the money in the Construction Draw Account satisfies the first requirement that there be specific and identifiable money.  Masvidal v. Ochoa, 505 So. 2d 555, 556 (Fla. 3d DCA 1987)(conversion can be asserted where a party embezzles funds from an escrow account).   The amount of funds is not disputed, and the parties stipulated that $178,343.01 was disbursed to Coconut 41 and Westwind Contracting Inc. on or about August 13, 2009, from the Construction Draw Account.  IberiaBank Exh. M; Doc. #285-9, ¶ 3.

**(b)  Immediate Right to Possession**

"The essence of the tort of conversion is the exercise of wrongful dominion or control over property to the detriment of the rights of the actual owner. [ ] Thus, conversion may occur where a person wrongfully refuses to relinquish property to which another has the right of possession." <u>Seymour v. Adams</u>, 638 So. 2d 1044, 1046-47 (Fla. 5th DCA 1994)(internal citations omitted).  Thus, HG Coconut must establish either possession or an immediate right to possess the money taken from the Construction Draw Account by Orion Bank and retained by Westwind Contracting.  The Court finds that HG Coconut has established neither.

The money in the Construction Draw Account belonged to Coconut 41, not to HG Coconut.  The origins of the money in the Construction Draw Account is the July 2, 2005, Land Purchase Contract.  HG Coconut paid $9.8 million for Development Area 2, but Coconut 41 agreed to pay for infrastructure work.  Section 9(b) of the Land Purchase Contract Addendum specifically provided that 10% of the purchase price paid to Coconut 41 would be held in escrow, and released to Coconut 41 upon proof of completion of the infrastructure work.  At the August 16, 2005, closing, $978,000 of the purchase price paid to Coconut 41 was placed by Coconut 41 into an escrow account pursuant to a written escrow agreement.  As of the closing, the entire purchase price, including the $978,000, became the property of Coconut 41, although Coconut 41 could not

receive the $978,000 until completion of the infrastructure work. No contract provision provided that any portion of the purchase price, including the 10% in escrow, would revert to HG Coconut under any circumstances.  The ownership and right to possession of these funds belonged to Coconut 41 as of the completion of the closing, and HG Coconut never thereafter had either ownership or a right to possess these funds.  In the verbiage of escrow accounts, Coconut 41 was the depositor or grantor, and was entitled to the return of the money upon the completion of the infrastructure obligations.

> An escrow account is defined as [a] bank account, generally held in the name of the depositor and an escrow agent, that is returnable to the depositor or paid to a third person on the fulfillment of specified conditions. [ ] 'Escrow' means [a] legal document or property delivered by a promisor to a third party to be held by the third party for a given amount of time or until the occurrence of a condition, at which time the third party is to hand over the document or property to the promisee and an account held in trust or as security.

Carl v. Republic Sec. Bank, 282 F. Supp. 2d 1358, 1367 (S.D. Fla. 2003)(internal quotation marks and citations omitted)(alterations in original).  "Under Florida law, 'legal title to property placed in an escrow account remains with the grantor until the occurrence of the condition specified in the escrow agreement.'"  In re Scanlon, 239 F.3d 1195, 1197-98 (11th Cir. 2001)(footnote and citations omitted).

The way the parties treated the escrow money thereafter confirms that the parties understood the money belonged only to

Coconut 41.  After the 2007 litigation, there was a 2009 Settlement Agreement which utilized the escrow account funds in two ways. First, HG Coconut, which had prevailed on summary judgment, was paid $185,000 in attorney fees from the escrow account.  Second, the infrastructure improvements were to be paid by Coconut 41 from three sources: First, the Orion Bank loan proceeds; second, the $793,000 in escrow account funds which were to be deposited into the Construction Draw Account; and third, Coconut 41's promise to pay any deficiency amount.  HG Coconut would hardly have used its own money to pay itself prevailing party attorney fees, and would not have used its own money to pay for the remainder of the infrastructure construction costs, which had always been Coconut 41's contractual obligation.

**(c) Unauthorized Act Depriving HG Coconut of Funds**

"It is well settled that a conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time." <u>Mayo v. Allen</u>, 973 So. 2d 1257, 1258 (Fla. 1st DCA 2008)(citations omitted).  There was no unauthorized act by Westwind Contracting in connection with the submission of the construction draw application or in its initial receipt of the money.  Mr. Parks testified that he reviewed and approved applications for payment by Westwind Contracting, including application No. 30 for the $178,343.01, and that the work performed and billed under the $178,343.01 draw benefitted Development Area

2 because it was work which had to be done in order for Development Area 2 to be accessed from Coconut Road in the future.  Mr. Leve testified that the widening of Coconut Road was a condition for development of Development Area 2, and that he had no basis to refute the testimony of Mr. Parks that work was done.

**(d) Failure to Return Money After Demand**

HG Coconut asserts, however, that the unauthorized act was Westwind Contracting's refusal to return the money after demand by HG Coconut.   "The generally accepted rule is that demand and refusal are unnecessary where the act complained of amounts to a conversion regardless of whether a demand is made."  Goodrich v. Malowney, 157 So. 2d 829, 832 (Fla. 2d DCA 1963).  "But while a demand and refusal constitute evidence that a conversion has occurred, it is unnecessary to prove a demand and refusal where the conversion can be otherwise shown."  Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd., 450 So. 2d 1157, 1161 (Fla. 3d DCA 1984). Nonetheless, "[c]onversion may be demonstrated by a plaintiff's demand [for return] and a defendant's refusal."  Mayo v. Allen, 973 So. 2d 1257, 1259 (Fla. 1st DCA 2008)(citation omitted).  "A conversion occurs when a person who has a right to possession of property demands its return and the demand is not or cannot be met."  Shelby Mut. Ins. Co. v. Crain Press, Inc., 481 So. 2d 501, 503 (Fla. 2d DCA 1985).  The Court finds that because HG Coconut was not entitled to possession of the money in the Construction

Draw Account, the refusal to return the money to it by Westwind Contracting was not an unauthorized act.

### (5) Summary of Disposition of HG Coconut Claims

For the reasons stated above, HG Coconut fails on its claim of fraudulent lien in Count I, and shall take nothing against Westwind Contracting.  HG Coconut fails as to slander of title and Westwind Contracting shall take nothing as to Count II.  HG Coconut fails as to the claim of conversion and Westwind Contracting shall take nothing as to Count III.

### C.  HG Coconut Claim Against IberiaBank

HG Coconut brings a single count Counterclaim against IberiaBank, as successor to Orion Bank, for breach of contract. (Doc. #201.)  HG Coconut asserts that Orion Bank breached the Settlement and Infrastructure Agreement by releasing $188,175.99 from the Construction Draw Account to Coconut 41 for construction draws No. 30 and 31 before first having fully funded its Loan Portion, and without complying with any of the requirements of §4(b)(iv) of the Settlement and Infrastructure Agreement.  The liability of IberiaBank is premised on its assumption of liabilities as described in §§ 2.2 and 4.5 of the Purchase and Assumption Agreement.  IberiaBank denied liability, and raised multiple affirmative defenses.  (Doc. #315.)

IberiaBank argues that the court has no subject-matter jurisdiction over the breach of contract claim because HG Coconut has not exhausted its administrative remedies.  A district court does not have jurisdiction over "(i) any claim or action for

payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the [FDIC] has been appointed receiver, including assets which the [FDIC] may acquire from itself as such receiver . . . or (ii) any claim relating to any act or omission of such institution or the [FDIC]" 12 U.S.C. § 1821(d)(13)(D)(i), (ii).  The Eleventh Circuit has interpreted this statute to mean that "for post-receivership claims . . . the court has 'no subject matter jurisdiction unless the claimant has exhausted the administrative remedies.'" Interface Kanner, LLC v. JPMorgan Chase Bank, N.A., 704 F.3d 927, 934 (11th Cir. 2013)(citations omitted).  There is no evidence of such exhaustion in this case, and therefore HG Coconut's Counterclaim against IberiaBank is dismissed without prejudice for lack of subject-matter jurisdiction.

Even if subject matter jurisdiction were present, the breach of contract claim is barred under D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 (1942).  See 12 U.S.C. § 1823(e).  The Eleventh Circuit recently summarized the D'Oench Doctrine as follows:

> In D'Oench, the Supreme Court opined that "in litigation between a bank customer and the FDIC, as successor in interest to a bank, the customer may not rely on agreements outside the documents contained in the bank's records to defeat a claim of the FDIC." Baumann v. Savers Fed. Sav. & Loan Ass'n, 934 F.2d 1506, 1514–15 (11th Cir. 1991) (citing D'Oench, 315 U.S. at 459, 62 S. Ct. at 680). The D'Oench case generated the so-called D'Oench Doctrine, which is simply a rule that:
>
> > In a suit over the enforcement of an agreement originally executed between an insured depository institution and a private party, a private party may not enforce against a federal deposit insurer any obligation not

> specifically memorialized in a written
> document such that the agency would be aware
> of the obligation when conducting an
> examination of the institution's records.

<u>Id.</u> at 1515.

<u>Lindley v. FDIC</u>, ___ F.3d ___, 2013 WL 4269389, at *4 (11th Cir. Aug. 16, 2013). The <u>D'Oench</u> Doctrine is codified at 12 U.S.C. § 1823(e), which provides, in part:

> No agreement which tends to diminish or defeat the
> interest of the [FDIC] in any asset acquired by it ...
> shall be valid against the [FDIC] unless such agreement—
>
> (A) is in writing,
>
> (B) was executed by the depository institution
> and any person claiming an adverse interest
> thereunder, including the obligor,
> contemporaneously with the acquisition of the
> asset by the depository institution,
>
> (C) was approved by the board of directors of
> the depository institution or its loan
> committee, which approval shall be reflected
> in the minutes of said board or committee, and
>
> (D) has been, continuously, from the time of
> its execution, an official record of the
> depository institution.

12 U.S.C. § 1823(e)(1). "Section 1823(e) gets additional strength from § 1821(d)(9)(A) which provides, in part, that 'any agreement which does not meet the requirements set forth in section 1823(e). . .shall not form the basis of, or substantially comprise, a claim against the [FDIC].'" <u>Lindley</u>, 2013 WL at *4 (alterations in original). A successor institution is entitled to the same protection. <u>First Union Nat'l Bank of Fla. v. Hall</u>, 123 F.3d 1374, 1379 (11th Cir. 1997). The parties stipulated that IberiaBank had permission from the FDIC to assert the defense on its own behalf.

There was no evidence that the Orion Bank Board of Directors or the Orion Bank Loan Committee approved the Settlement and Infrastructure Agreement.  The evidence was uncontradicted that the Orion Bank minutes for both the loan committee and board of directors contained no mention of the Settlement and Infrastructure Agreement.  Ms. Davidson of the FDIC testified that all of the documents downloaded and collected at the closing of Orion Bank were placed in a digital mass storage system for data processing.  Ms. Davidson also conducted a word search in the 2008 and 2009 board and loan committee minutes and found no mention of a settlement agreement between Coconut 41, HG Coconut, Land Development Group, and Orion Bank.  Therefore, in the alternative, the Settlement and Infrastructure Agreement is not valid against IberiaBank.

Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1.  Westwind Contracting's motion to dismiss Count I of its Third Amended Cross-Claim (Doc. #155) is **denied** and HG Coconut's motion for partial judgment as to Count I of the Third Amended Cross-Claim is **granted.**

2.  The Clerk shall enter judgment as to the Westwind Contracting Third Amended Cross-Claim (Doc. #155) as follows:

A.  As to Count I, in favor of HG Coconut and against Westwind Contracting, which shall take nothing; and

B.  As to Count II, in favor of Westwind Contracting and against HG Coconut, in the amount of $316,665.32, plus

prejudgment interest in the amount of $85,098.36, totaling $401,763.68.

3.   The Clerk shall enter judgment as to the HG Coconut Counter Crossclaim (Doc. #170) as to all counts (Counts I, II, and III) in favor of Westwind Contracting and against HG Coconut, who shall take nothing.

4.   The Clerk shall enter judgment as to the HG Coconut Counterclaim (Doc. #201) in favor of IberiaBank and against HG Coconut dismissing the Counterclaim without prejudice for lack of jurisdiction, and alternatively in favor of IberiaBank and against HG Coconut, which shall take nothing.

5.   The Clerk is further directed to terminate all remaining deadlines and to close the file.

6.   Any motions for attorney's fees and costs, with supporting memorandum and documents, shall be filed within **FOURTEEN (14) DAYS** of the entry of the judgment as provided by M.D. Fla. R. 4.18(a).

**DONE AND ORDERED** at Fort Myers, Florida, this __18th__ day of November, 2013.

JOHN E. STEELE
UNITED STATES DISTRICT JUDGE

Copies:
Counsel of record